UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 11-11422-RWZ

STONEWOOD CAPITAL MANAGEMENT, INC.

v.

A. SILVANA GINER and ANDREW R. BELT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CIVIL ACTION NO. 12-11271-RWZ

SBC EQUITY PARTNERS MANAGEMENT CO., LLC. *et al.*

v.

A. SILVANA GINER and ANDREW R. BELT

MEMORANDUM OF DECISION

January 3, 2013

ZOBEL, D.J.

   Stonewood Capital Management, Inc. ("Stonewood") has sued A. Silvana Giner ("Giner") and Andrew R. Belt ("Belt") for tortious interference with prospective economic advantage. It claims that Giner and Belt, two board members of Giner, Inc., broke up Stonewood's proposed deal to buy that company. Giner and Belt now move for summary judgment.[1]

**I.     Background**

---

[1] The court has reviewed the pending discovery motions, and finds that none of them seek evidence that could affect its conclusions below. Therefore, the motion for summary judgment is ripe for decision.

Stonewood is a private equity firm based in Pennsylvania. It manages the investment strategy of a limited partnership called SBC Equity Partners, LP ("SBC Equity Partners"). The members of that partnership included SBC Equity Partners Management Co., LLC (the general partner), J. Kenneth Moritz (the president of Stonewood), John Tippins, William Tippins, George Knapp, Peter Muth, and JWA Investments, LLC (collectively, the "SBC Plaintiffs").

In early 2011, Stonewood expressed interest in buying Giner, Inc., a small Massachusetts technology company founded by Giner's father. At the time, both Giner and Belt were on the board of directors of Giner, Inc. The parties began negotiating, and in April 2011 they signed a letter of intent memorializing certain proposed terms for the contemplated transaction. Following its usual practice, Stonewood planned to set up a new entity named Giner Acquisition Co., LLC ("Giner Acquisition") as a purchasing vehicle. The SBC Plaintiffs would contribute funds to SBC Equity Partners, which would invest in Giner Acquisition, which would then purchase Giner, Inc. At the end of the transaction, the SBC Plaintiffs would indirectly be the new owners of the assets that formerly belonged to Giner, Inc.

On June 22, 2011, Giner, Inc. informed Stonewood that it was no longer interested in a deal. Stonewood claims that Giner, Inc.'s change of heart was orchestrated by Giner and Belt, who proposed their own deal to replace Stonewood's offer. Giner, Inc. eventually pursued the alternative transaction proposed by Giner and Belt; that alternative transaction closed in December 2011.

Stonewood initially sued Giner, Inc. and one of its subsidiaries for breach of

contract, as well as Silvana Giner for tortious interference with contract and with prospective economic advantage. This court dismissed the contract-based claims, leaving only the claim of tortious interference with prospective economic advantage against Giner. The complaint was later amended to add a similar claim against Belt. The SBC Plaintiffs then filed an action against Giner and Belt asserting the same claims; that action was consolidated with Stonewood's.

## II.     Legal Standard

Summary judgment will be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The court must view the record in the light most favorable to the nonmoving party and draw all justifiable inferences in that party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Summary judgment against a party is appropriate if that party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In that situation, the moving party need not bring affirmative evidence; it need only "point[] out . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

## III.    Analysis

Under Massachusetts law, the elements of a claim for tortious interference with prospective economic advantage are: "(1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's interference with it through improper motive or means; and (4) the

plaintiff's loss of advantage directly resulting from the defendant's conduct." Am. Private Line Servs. v. E. Microwave, Inc., 980 F.2d 33, 36 (1st Cir. 1992); see Blackstone v. Cashman, 860 N.E.2d 7, 12-13 (Mass. 2007). Where a corporate official acting within the scope of his corporate responsibilities is sued for intentional interference with prospective economic advantage, it is not enough for the plaintiff to show interference by improper motive or means; instead, he must show that the corporate official acted with actual malice, meaning "a spiteful, malignant purpose, unrelated to the legitimate corporate interest." Blackstone, 860 N.E.2d at 13 (quoting Wright v. Shriners Hosp. for Crippled Children, 589 N.E.2d 1241, 1246 (Mass. 1992)).

Giner and Belt raise three major arguments in their motion for summary judgment. First, they argue that neither Stonewood nor the SBC Plaintiffs had a business relationship or contemplated contract with Giner, Inc. Second, they argue that because they are directors of Giner, Inc., Stonewood must show that they acted with actual malice, and Stonewood has made no such showing. Third, they argue that even if they are not entitled to an actual malice standard, there is no evidence to show they interfered with the deal through any improper motive or means.

**A. Business Relationship**

Under the contemplated deal, Stonewood planned to create the shell entity Giner Acquisition to purchase Giner, Inc.'s assets. The various contract drafts exchanged between Stonewood and Giner, Inc. named Giner Acquisition as the prospective buyer. But because the deal fell through, Giner Acquisition was never created.

If Giner Acquisition had existed during the parties' negotiations, it would clearly have had a business relationship with Giner, Inc. through their contemplated contract, thereby satisfying the first element of a tortious interference claim. But Giner and Belt argue that because Giner Acquisition never came into existence, no entity can assert a business relationship here. They argue that Stonewood cannot assert a business relationship because it was not the intended buyer of Giner, Inc.'s assets; the SBC Plaintiffs cannot assert a business relationship because they were not parties to the negotiations or the contemplated contract; and Giner Acquisition cannot assert a business relationship because it did not and does not exist.

The law has often considered contracts made in the name of corporations that do not yet exist. It is hornbook law that such contracts are treated as belonging to the promoter who expects to organize the corporation. One treatise puts it succinctly:

> Contracts are frequently made by promoters on behalf of corporations they expect to organize. Often, the terms of these contracts are of a kind which, if the corporation were already in existence, the contract would be that of the corporation and not of the promoter. However, since it is impossible for the corporation to contract before it comes into existence, the contract is treated as that of the promoter even though the language of the contract is appropriate for a contract by the corporation.

12 Williston on Contracts § 35:71 (West 2012). Massachusetts law is to the same effect. See, e.g., Island Transp. Co. v. Cavanaugh, 767 N.E.2d 609, 613 (Mass. App. Ct. 2002) (promoter is "liable upon, and entitled to the benefit of, contracts that he had made in behalf of the corporation to be formed").

The question in this case is slightly more complicated. Stonewood does not assert a contract right based on an actual contract on behalf of Giner Acquisition; it

asserts a tort claim based on interference with a contemplated contract. Whether that claim is available appears to be a question of first impression. The parties have cited no authority addressing this precise situation, and the court has found none. But given the principles above, and the reality of modern business transactions, the court concludes Massachusetts courts would find that a promoter may assert a claim for tortious interference based on a contemplated contract on behalf of an unformed corporation.

Massachusetts law already makes clear that an actual contract on behalf of an unformed corporation belongs to its promoter. It stands to reason that a contemplated contract on behalf of an unformed corporation should also belong to its promoter. That being so, the promoter should be able to base a claim for tortious interference on such a contemplated contract.

Moreover, the purposes of the tort support this conclusion. The tort of intentional interference with prospective economic advantage is intended to protect contemplated contracts from wrongful disruption by third parties. It compensates economic actors who put serious effort into business negotiations, only to find that a third party has used threats, defamation, or other improper means to destroy them. Likewise, the tort deters third parties with improper motives from wrongfully interfering with their adversaries' businesses. These purposes apply just as strongly to contemplated contracts negotiated by promoters for unformed corporations as they do for any other contemplated contracts.

Finally, it is a reality of the modern business world that many mergers and

acquisitions are structured using ad hoc entities that are formed solely to carry out the transaction. These entities are normally created shortly before the deal is signed and effectively vanish when the deal closes. They are controlled throughout by their promoters. They have no independent economic reality beyond their role in the transaction. As such, it would make no sense to insist that the promoter who actually negotiates the deal cannot assert a business relationship and a contemplated contract with the other party merely because the structure of the proposed deal included such an ad hoc entity. And there is no point in requiring the promoter to go through the formality of creating the ad hoc entity in advance of negotiations just to ensure that entity will be able to bring a tortious interference claim.

For those reasons, the court concludes that a Massachusetts court would find a promoter can assert a claim for tortious interference with prospective economic advantage based on a contemplated contract on behalf of an unformed business entity. Therefore, Stonewood may assert Giner Acquisition's contemplated contract with Giner, Inc. to meet the first element of its tortious interference claim. The SBC Plaintiffs, however, were not the promoters of Giner Acquisition, and they have no independent business relationship with Giner, Inc. The SBC Plaintiffs have thus failed to meet the first element of their tortious interference claim, and so Giner and Belt are entitled to summary judgment against them.

### B. Actual Malice

When acting within the scope of her corporate responsibilities, a corporate official is only liable for intentional interference with prospective economic advantage if

he or she acts with actual malice. Blackstone, 860 N.E.2d at 13. "The 'actual malice' standard . . . is a burden placed on the plaintiff, not a defense that must be proved by the defendant." Id.

On defendants' previous motion to dismiss, the court refused to apply the actual malice standard because Stonewood alleged that "Giner was acting for her own account, not on behalf of the company." Docket # 19, Order at 7. Now, at summary judgment, Giner and Belt argue that Stonewood has failed to present facts showing that Giner and Belt were acting outside the scope of their corporate responsibility. They conclude that the actual malice standard is appropriate.

The Supreme Judicial Court of Massachusetts clarified the applicability of the actual malice standard in Blackstone v. Cashman, 860 N.E. 2d 7 (Mass. 2007). In Blackstone, a corporate director named Cashman who was not involved in the day-to-day operation of his company was entitled to a $20,000 payment from the company each month. One month, he did not receive his payment. Concerned that the company's accountant, Blackstone, was improperly witholding it, he called the company office and demanded his check. When Blackstone refused to send it, Cashman swore at him. Cashman then called the company's manager, Ferrari, and angrily threatened physical violence against Blackstone. When Blackstone learned of the threats, he grew extremely agitated and eventually left the company. Blackstone then sued Cashman for intentional interference with prospective economic advantage, claiming that he would have continued at the company if Cashman had not threatened him. Id. at 10-12.

The Supreme Judicial Court found that Cashman was entitled to a jury

instruction on the actual malice standard. It held that as a director, Cashman qualified as a corporate official even though he was not involved in the day-to-day activities of the company. Id. at 17-18. Furthermore, it held that Cashman was still acting as a corporate official even though "the interest pursued by Cashman was the payment of money to himself." Id. at 18. It explained that "[a]s a director, Cashman acted within the scope of his responsibilities in demanding that corporate officers like Blackstone and Ferrari meet the obligations of the corporation to him." The Supreme Judicial Court thus held that a corporate official may be carrying out his corporate responsibilities, and so entitled to the actual malice standard, even when the official's actions result in his own financial gain.

      Here, even taking the facts in the light most favorable to Stonewood, Giner and Belt are entitled to the actual malice standard. Despite Stonewood's allegations that Giner and Belt were acting for themselves and not on behalf of the company, the facts Stonewood has produced show otherwise. It is undisputed that Giner and Belt were both directors of Giner, Inc. As directors, upon receiving Stonewood's offer to buy Giner, Inc., Giner and Belt were duty-bound to reasonably consider other options that might be better for the company. See Blackstone, 860 N.E.2d at 17 (directors' duties of loyalty and care require "'reasonable intelligence' in the oversight of corporate business"). In other words, their corporate responsibilities as directors included looking at possible alternative transactions, which is exactly what they did. The fact that their alternative transaction was in their financial interest, of course, does not show they acted outside their corporate responsibilities. See id. at 18. Stonewood has also

9

produced evidence that the alternative transaction was worse for the company than Stonewood's deal, and that Giner and Belt knew that. But even that evidence cannot show Giner and Belt acted outside of their corporate duties—it can only show Giner and Belt did a bad job fulfilling their duties. The actual malice standard is precisely intended to prevent courts from second-guessing such internal corporate activities. See id. at 16 n.15 ("[I]n matters related to the conduct of the internal affairs of a corporation, corporate officials require a heightened level of protection from liability.").

Stonewood argues that Giner and Belt acted unilaterally, without the approval of the rest of the board, in preparing the alternative transaction and in leading Giner, Inc. to reject the Stonewood deal. However, it does not present any evidence from which a reasonable jury could conclude that any unilateral actions by either Giner or Belt fell outside of their authority as corporate directors. Furthermore, it is undisputed that by July 5, 2011, the board of Giner, Inc. had met as a whole and officially decided to reject Stonewood's deal in favor of the alternative transaction.

Because Giner and Belt are protected by the actual malice standard, Stonewood must present facts allowing a reasonable inference that they acted from "a spiteful, malignant purpose, unrelated to the legitimate corporate interest." Blackstone, 860 N.E.2d at 13 (quoting Wright, 589 N.E.2d at 1246). It has not presented any such facts. Therefore, Giner and Belt are entitled to summary judgment on Stonewood's claim.

**C. Improper Motive and Improper Means**

Even if Giner and Belt were not covered by the actual malice standard, Stonewood would still have to present facts showing that Giner and Belt had acted from

an improper motive or by improper means. Stonewood has not met that burden either.

### 1. Improper Motive

Stonewood concedes, as it must, that personal financial gain is not an improper motive. See Am. Private Line Servs.,980 F.2d at 37 (no improper motive where party's "sole motivation was its own financial benefit"); King v. Driscoll, 638 N.E.2d 488, 495 (Mass. 1994) ("The motivation of personal gain, including financial gain, however, generally is not enough to satisfy the improper interference requirement."). With respect to Giner, it concedes that Giner's potential financial benefit from interfering with the Stonewood transaction does not show an improper motive. With respect to Belt, it argues that Belt was upset when he learned Stonewood did not plan to keep him as a paid consultant at Giner, Inc., and that he was motivated to interfere in order to keep his role at the company. But Stonewood does not explain how Belt's desire to keep his consulting role is anything but a personal financial motive. Belt's alleged desire to keep his job is not the type of motive Massachusetts courts have found improper in the past. See, e.g., Comey v. Hill, 438 N.E.2d 811, 816 (Mass. 1982) (finding age discrimination an improper motive); Adcom Prods., Inc. v. Konica Bus. Machs. USA, Inc., 668 N.E.2d 866, 869-70 (Mass. App. Ct. 1996) (evidence of longstanding personal enmity supports finding of improper motive). Stonewood's evidence that Belt was upset at Stonewood is not enough to raise an inference that Belt acted purely out of spite, as "personal dislike will not warrant an inference of the requisite ill will." King, 638 N.E.2d. at 495.

### 2. Improper Means

"To demonstrate improper means, a plaintiff must prove improper conduct

11

beyond the fact of the interference itself." Bartle v. Berry, 953 N.E.2d 243, 250 (Mass. App. Ct. 2011). Such improper conduct may occur where a party "violated a statute or rule of common law," or "used threats, misrepresented any facts, defamed anyone, or used any other improper means." United Truck Leasing Corp. v. Geltman, 551 N.E.2d 20, 24 (Mass. 1990). The Supreme Judicial Court has indicated that the factors listed in Section 767 of the Restatement (Second) of Torts may be helpful in determining whether a particular act constitutes improper means. Id. at 24 n.10.[2] Determining whether particular means are improper requires a case-by-case analysis, see Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 690 (Mass. 2005), but summary judgment is nevertheless appropriate if the plaintiff fails to advance evidence supporting this element of the claim.

Stonewood advances five theories in its brief as to how the actions of Giner and Belt might constitute interference by improper means. None can survive summary judgment.

First, Stonewood claims that Giner and Belt used it as a "stalking horse," by allowing it to propose a transaction and then simply mirroring it in their own alternative proposal. Stonewood argues that this "stalking horse" ploy was deceptive on the part of Giner and Belt and therefore improper. But the allegation that Giner and Belt used Stonewood as a "stalking horse" does not speak to the means that Giner and Belt used

---

[2] Those factors include the nature of the actor's conduct, the actor's motive, the interests of the party interfered with, the interests of the actor, the social and contractual interests at play, the proximity of the actor's conduct to the interference, and the relations between the parties. Restatement (Second) of Torts § 767 (West 2012).

to break up Stonewood's deal. Simply offering an alternative proposal—even a proposal that mirrors an existing proposal—is not itself improper. Nor has Stonewood presented evidence from which a reasonable jury could conclude that Giner and Belt deceived Stonewood into creating its proposal in the first place, while planning all along to steal it.

Second, Stonewood presents evidence that Giner told Giner, Inc.'s attorneys not to communicate with Stonewood about its revised draft because she was going to propose an alternative transaction. Stonewood submitted its revised draft to Giner, Inc. on June 14, 2011; the company rejected Stonewood's proposal on June 22, 2011. Even assuming that Giner acted outside her corporate responsibilities by talking to her company's attorneys, there is no evidence that she acted improperly towards them (such as by threatening or coercing them). And even if she did act improperly, there is no evidence her actions interfered with the deal. Stonewood has produced nothing to show that Giner, Inc.'s eight days of silence between June 14 and June 22 actually caused the deal to break up. A reasonable jury could not conclude that Giner, Inc.'s own delay in commenting on Stonewood's proposal was what caused the company to reject that deal.

Third, Stonewood argues that the alternative transaction proposed by Giner and Belt paid Giner, Inc.'s minority shareholders less than Stonewood's transaction would have, harming those shareholders. But that harm occurred when the alternative transaction closed, well after Giner, Inc. rejected Stonewood's deal. As such, it cannot be a means of interference with the deal. To the extent that Stonewood alleges Giner

and Belt improperly interfered by misleading Giner, Inc. about the terms of their alternative proposal, there is no evidence supporting that claim.

Fourth, Stonewood argues that Giner and Belt used confidential information from Stonewood's proposal in order to structure their own. This allegation allowed Stonewood to survive a motion to dismiss on its claim, as the misuse of confidential information is clearly an improper means. However, Stonewood has not produced evidence sufficient to support its allegation. In its brief, Stonewood does not clearly identify what specific confidential information it believes Giner and Belt misused; instead, it refers generally to Stonewood's due diligence on Giner, Inc. and the resulting acquisition proposal (including the proposed per-share price), which it claims Giner and Belt mirrored. It cites to one piece of evidence in the record showing that Belt knew Stonewood's due diligence had found Giner, Inc. to be in sound financial health with good future prospects. It also cites other evidence showing that the alternative transaction Giner and Belt proposed was based on Stonewood's contemplated transaction, and that it was intended to leave everyone at Giner, Inc. doing as well as or better than they would have done under Stonewood's plan.

This evidence is not sufficient to raise a reasonable inference that Giner and Belt misused Stonewood's confidential information. First, Giner and Belt were clearly acting within their corporate responsibilities as directors in assessing the value of Stonewood's deal and considering alternative transaction options. Indeed, as directors they had an affirmative duty to reasonably consider any alternative transactions that might be better for the company. See Blackstone, 860 N.E.2d at 17 (citing Prod. Mach.

Co. v. Howe, 99 N.E.2d. 32, 35 (Mass. 1951) (directors have duty to reasonably oversee corporate business). That was the reason Stonewood provided its confidential information to Giner and Belt in the first place. Because Giner and Belt's corporate responsibilities included using Stonewood's information to consider alternative transactions, Stonewood cannot sustain its claim on this basis without showing actual malice—which it has not done. Furthermore, even if Giner and Belt were not protected by the actual malice standard, Stonewood's factual showing is too weak to sustain a reasonable inference of misuse of confidential information. It cannot rest upon its "conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

Fifth, Stonewood argues that Belt misled it by telling it on June 22, 2011, that he would try to get the deal back on track, even though he had no intention of doing so. At oral argument, Stonewood claimed that Belt's misrepresentation "cut off" negotiations between Stonewood and Giner, Inc., because Stonewood believed Belt would adequately rectify the situation. The record does not support that conclusion. According to the undisputed facts, Stonewood continued to negotiate with Giner, Inc. after June 22, including by sending it a revised asset purchase agreement on June 29, 2011. Stonewood therefore cannot show that Belt's misrepresentation, assuming it was improper, actually interfered with the contemplated transaction.

Because Stonewood has not presented evidence from which a reasonable jury could find that Giner or Belt interfered with its transaction through an improper motive or improper means, even assuming that the higher actual malice standard does not

apply, Giner and Belt are entitled to summary judgment.

## IV. Conclusion

Defendants' motion for summary judgment (Docket # 81) is ALLOWED. The SBC Plaintiffs' motion to seal (Docket # 96) and the joint motion to file consolidated briefs (Docket # 76) are also ALLOWED. The other pending motions (Docket ## 47, 50, 57, 60, 65, 68, 71 and 88) are DENIED as moot.

Judgment may enter accordingly.

|  |  |
|---|---|
| January 3, 2013 | /s/Rya W. Zobel |
| DATE | RYA W. ZOBEL |
|  | UNITED STATES DISTRICT JUDGE |